Karina A. Smith (SBN 286680)
karina.smith@bakerbotts.com
Brooke Chatterton (SBN 317386)
brooke.chatterton@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. One, Suite 200
Palo Alto, CA  94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699

*Attorneys for Plaintiff*
Corey Anthony Merino

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

(San Jose Division)

| | |
|---|---|
| COREY ANTHONY MERINO,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF SANTA CLARA and DOES 1 THROUGH 12, INCLUSIVE,<br><br>Defendants. | Case No. 5:18-cv-02899-VKD<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II (42 U.S.C. § 12101 et seq.), AND SECTION 504 OF THE REHABILITATION ACT (29 U.S.C. § 794)** |

Plaintiff Corey Anthony Merino ("Plaintiff") brings this Complaint against Defendants County of Santa Clara ("County"), and Does 1 through 12, inclusive (all defendants collectively, "Defendants"). Plaintiff alleges as follows:

**THE PARTIES**

1.      Plaintiff is an individual, and was at all times mentioned herein a resident of Santa Clara County, California. Plaintiff brings this action on his own behalf. Plaintiff is a person with a disability as defined in 42 U.S.C. § 12102 and 29 U.S.C. § 705(9)(B). He was incarcerated in County from May 25, 2017 to November 18, 2017. Before, during, and after his time in the Santa Clara County Main Jail Complex ("Main Jail") and the Elmwood Men's Correctional Complex ("Elmwood Facility"), where he was housed from May 26, 2017 to November 18, 2017, Plaintiff has suffered from a serious lower back condition that requires treatment involving narcotic medication and specialized insoles or shoes to relieve pain and enhance stability. Plaintiff has had serious lower back problems since at least 2005, and has received focused medical treatment for his disability since at least 2011, six years prior to his incarceration at the Elmwood Facility. County's policies and practices, and failure to accommodate his disability, resulted in Plaintiff sustaining injuries. Plaintiff was also the victim of a ruthless gang beating upon his arrival at the Elmwood Facility, which resulted in physical and psychological harm to Plaintiff. County and Does 3 through 8 could have easily prevented this attack, but did not. The harm Plaintiff suffered was exacerbated by County's and Does 9 through 12's failure to provide the prescribed follow-up care.

2.      County is a "local public entity" as defined by Cal. Gov. Code § 900.4, is a "person" within the meaning of 42 U.S.C. § 1983, and is a public entity, duly organized and existing under the laws of the State of California. Under its authority, County operates and manages the Elmwood Facility and is and was at all relevant times mentioned herein responsible for the actions and/or inactions and the policies, procedures, and practices/customs of the Elmwood Facility staff and its employees and/or agents. Upon information and belief, County employs 12 or more persons who were responsible for Plaintiff's supervision and medical care while he was incarcerated at the Main Jail and the Elmwood Facility. County is ultimately responsible for, and retains ultimate authority over, the operation of the Main Jail and the Elmwood Facility, including the housing and treatment of Plaintiff during the relevant

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

1  period.

2      3.      Upon information and belief, County receives state and federal funds for the operation of

3  the Main Jail and the Elmwood Facility, and received such funds at all times relevant to allegations

4  raised in this Complaint.

5      4.      Plaintiff is informed and believes, and thereon alleges, that at all times relevant to

6  allegations raised in this Complaint, and prior to and including the date of the incident, Does 1 through

7  12,  and each of them, are or were guards, detectives, officers, employees, agents, servants, medical staff

8  and/or contractors of County, whose actions and inactions caused or contributed to the violations of

9  Plaintiff's civil rights claimed herein. Does 1 and 2 are medical intake nurses and/or staff who conducted

10 Plaintiff's medical interview upon his arrival at the Main Jail. Does 3 through 5 are the officers who

11 investigated Plaintiff's sexual harassment. Does 6 through 8 are guards who were responsible for

12 supervising Plaintiff's housing unit at the Elmwood Facility when he was attacked. Does 9 through 12

13 are staff and/or officers who treated Plaintiff in the infirmary and/or participated in evaluating Plaintiff's

14 grievances. Plaintiff will amend this Complaint to allege Does 1 through 12's true names and capacities

15 when ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously

16 named Defendants is responsible in some manner for the occurrences alleged in this Complaint. Because

17 Does 1 through 12 are agents of County, County is liable for their actions taken within the scope of their

18 agency.

19                          **JURISDICTION AND VENUE**

20     5.      This Complaint seeks damages for violations of the civil rights privileges and immunities

21 guaranteed by the Fourteenth Amendment of the United States Constitution pursuant to 42 U.S.C. §§

22 1983 and 1988. This Court has jurisdiction over Plaintiff's claims arising under 42 U.S.C. §§ 1983 and

23 1988 pursuant to 28 U.S.C. §§ 1331 and 1343.

24     6.      This Court has jurisdiction over Plaintiff's claims arising under Title II of the Americans

25 with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Rehabilitation Act" or

26 "Section 504"), and the regulations promulgated thereunder, pursuant to 28 U.S.C. §§ 1331 and 1343.

27     7.      This Court also has authority under the ADA pursuant to 42 U.S.C. § 12205, under

28 Section 504 pursuant to 29 U.S.C. § 794a(b), and pursuant to 42 U.S.C. § 1988 to award Plaintiff's

reasonable attorneys' fees and costs.

<strong><u>VENUE</u></strong>

8.     Plaintiff's claims arose in Santa Clara County, California. Venue, therefore, lies in the Northern District of California pursuant to 28 U.S.C. § 1391(b)(2).

9.     Rule 3 of the Federal Rules of Civil Procedure and Local Rule 3-2(e) authorize assignment to this division because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Santa Clara County, which is served by this division.

<strong><u>FACTS COMMON TO ALL CLAIMS</u></strong>

**A.  <u>Plaintiff's Disability and Resulting Discrimination</u>**

10.     Plaintiff suffers from a herniation of the disks in his lower back which has caused Plaintiff to suffer from substantial lower back pain since at least 2005. Since at least 2005, this condition substantially limited and interfered with Plaintiff's ability to engage in major life events such as sleeping, performing manual tasks, and working. Because of this condition, Plaintiff has been prescribed strong narcotic medications for pain management (150 mg of oxycodone taken daily), and shoe inserts to aid his functional movement and stability. This condition qualifies as a disability within the meaning of the ADA.

11.     Plaintiff was booked into the Main Jail on May 25, 2017 and was transferred to the Elmwood Facility within 24 hours of his booking.

12.     As a part of Plaintiff's intake process at the Main Jail, Does 1 through 2 conducted Plaintiff's medical interview. At the medical interview, Plaintiff told Does 1 through 2 that he had a documented history of herniation in the disks of his lower back, and about his need for pain medication and special footwear for treatment of his condition. Prior to his incarceration at the Main Jail and the Elmwood Facility, Plaintiff was prescribed and took 150 mg of Oxycodone throughout each day to manage the pain caused by his disability. Plaintiff informed Does 1 through 2 of this dosage and frequency, and that the existence and severity of this medical condition could be confirmed by his primary care physician, whose contact information he provided to them. Instead of verifying Plaintiff's condition and providing accommodation, Does 1 through 2 told Plaintiff that he was "in jail now," and that "in here you only get ibuprofen."

3

13.     Does 1 through 2 did not contact Plaintiff's physician or consult his medical record to verify the condition or treatment. Instead, Does 1 through 2 denied Plaintiff's requests and informed him that he would not have access to narcotic medication while in the Main Jail and the Elmwood Facility to manage the pain of his disability. Throughout his entire stay at the Main Jain and the Elmwood Facility, Plaintiff never received prescription medication for his back pain.

14.     To obtain reasonable accommodations for his disability, Plaintiff sought chronos[1] (including a shoe chrono and a lower bunk chrono) to aid in pain relief and to allow him to engage in major life activities. A shoe chrono, for example, would have provided Plaintiff the needed stability and support not provided in standard prison footwear, enabling him to safely navigate the Main Jail and the Elmwood Facility. Instead, Does 1 through 2 and Does 9 through 12 denied Plaintiff access to this accommodation despite his documented history of his disability even prior to his incarceration at the Elmwood Facility.

15.     Due to the refusal of Does 1 through 2 and Does 9 through 12 to provide a shoe chrono, Plaintiff was unable to maintain his stability and fell as a result, suffering injuries to his shoulder that persist to this day. Four months later Plaintiff was given an MRI of his shoulder, which revealed that even after four months of healing, there still remained "[m]ild tenosynovitis around the distal aspect of the subscapularis tendon" and "[m]ild bursal sided tendinosis of the supraspinatus."

16.     After suffering this injury, Plaintiff again sought medical attention because of the intense pain that he experienced as a result of his disability and shoulder injury. Plaintiff sought a shoe chrono and lower bunk chrono. Based solely on a very brief visual assessment of the manner in which Plaintiff walked in and out of the examination room, Does 9 through 12 determined that Plaintiff's lower back herniation was not severe enough to qualify him for the requested shoe and lower bunk chronos. At his examination, Plaintiff informed Does 9 through 12 of the pain he was experiencing in his shoulder, but Does 9 through 12 denied the chrono request based on their observations that Plaintiff could lift his arm above his head (a painful task for Plaintiff), and that Plaintiff "remain[ed] pretty muscular." Does 9

---

[1] Chronos are smalls slips of paper (or white wristbands that an inmate wears) to be carried by an inmate, generated by prison staff, to outline approved movements and programs, and act to excuse an inmate from certain activities, such as work, to attend religious services. Chronos are generally available to prisoners who show need for accommodation.

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

through 12 had a duty to conduct a full and reasonable examination of Plaintiff in accordance with established medical standards. Such an examination did not happen. A shoe chrono would have helped Plaintiff's overall stability and ability to engage in the basic, major life activity of walking safely in his environment without the fear of injury.

17.     The shoe chrono would have helped the Plaintiff's stability. This accommodation was needed, as demonstrated by Plaintiff falling and injuring his shoulder when he tripped over the insufficient footwear. A lower bunk chrono would allow him to sleep on a bottom bunk, which would not only help ease his lower back pain, but also help avoid the painful task of repeatedly climbing the bed ladder and risking a fall or further aggravation of the shoulder injury. On at least two occasions, during his booking and after his shoulder injury, Plaintiff made requests for chronos as accommodations for his disabilities, and on each occasion, Does 9 through 12 denied his requests without adequate investigation or examination in accordance with established medical standards.

18.     Refusals of Plaintiff's requests for accommodations demonstrate County's established policy and practice of not ensuring inmates are properly evaluated for chronos, and not ensuring that those inmates with legitimate need receive proper accommodations. This policy and practice directly resulted in Plaintiff not receiving his needed accommodations, Plaintiff's unnecessary pain, and Plaintiff's subsequent shoulder injury.

**B.  Plaintiff's Unnecessary Beating and Inadequate Medical Care**

19.     At the Elmwood Facility, an inmate commonly joins the gang associated with their race for protection. Plaintiff, a Hispanic male with no gang affiliation, was housed with members of the Norteño gang, a gang composed of, and associated with, primarily Hispanic members. When an inmate enters a new dormitory, it is common for the gang affiliated with an inmate's race to approach an inmate to inspect his body for tattoos to discern if the inmate is gang affiliated. Inmates with no gang affiliation are not protected and are vulnerable to assault. On information and belief, County and Does 3 through 8, inclusive were intimately aware of these very common practices, and were, in fact, regularly trained on how to identify such common gang practices, when to expect to see these practices occur, how to properly prevent inmate harm, and how to intervene in these types of circumstances. It was Does 3

through 8's duty and responsibility to protect Plaintiff; they failed.[2]

20.     On Plaintiff's first day at the Elmwood Facility, May 27, 2017, Plaintiff was sexually harassed by two Norteño gang members while using the restroom. Plaintiff reported the sexual harassment to Does 3 through 5. Does 3 through 5 initiated an investigation under the Prison Rape Elimination Act (the "Act"), and Plaintiff was interviewed by a detective, Does 3 through 5, regarding the sexual harassment. When asked if he wanted to pursue a claim, Plaintiff indicated that he just wanted to be safe from harassment and retaliation. At that time, Plaintiff was already scheduled to be moved to another dormitory within the Elmwood Facility, away from the two attackers, where Plaintiff believed he would be safe from harm. Because the Norteño gang had a large presence throughout the Elmwood Facility, Plaintiff did not wish to place himself in more danger by pursuing a claim against Norteño gang members while living amongst them. The investigating officers, Does 3 through 5, informed Plaintiff that he was going to be moved anyway, and so Plaintiff declined to pursue charges under the Act. This conversation was at least partially recorded by Does 3 through 5 on an audio recording device.

21.     The same day, Plaintiff was moved into another general population dormitory within the Elmwood Facility, called "M8A." M8A is an open pod dormitory. As an open pod dormitory, prison guards have unobstructed views into the dormitory via a large glass window. M8A is monitored by cameras, and at least three prison guards monitor and care for M8A at all times.

22.     Immediately upon his arrival to M8A, Plaintiff was approached by Norteño gang members. The Norteño gang members inquired about Plaintiff's gang affiliations, and Plaintiff responded that he had none. The Norteño gang members attempted to move Plaintiff to the courtyard to make further inquiries and conduct a body inspection for tattoos. Plaintiff resisted moving to the courtyard, and Plaintiff instead lifted his shirt to show that he had no tattoos. Plaintiff was then attacked by the Norteño gang members who hit, beat and stomped on Plaintiff for an extended period of time (the "Beating"). Plaintiff did not resist or fight back.

23.     Despite Does 6 through 8 unobstructed view into the pod, not a single prison guard came to Plaintiff's aid until after Plaintiff had already been severely injured. The prison guards did not deploy

---

[2] "You can expect fair and equal treatment from us. … It is our job to keep you safe and secure." Santa Clara County Sheriff's Office Custody Bureau Inmate Handbook, p. 1, Revised July 2018.

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

pepper spray, which is part of prison guards' standard equipment, and which would have caused the Norteño gang members to disperse to a safe distance. The prison guards did not issue any verbal commands for Plaintiff's attackers to disperse, or employ any other type of deterrent countermeasure to protect Plaintiff from this horrendous attack.

24.    Upon information and belief, Does 3 through 8 and County are aware of these common gang practices, and knew or should have known before housing Plaintiff in M8A, that Plaintiff would be at risk of this type of incident occurring. Upon information and belief, County employs a task force dedicated to regional gang-related issues, the Santa Clara County Department of Correction's Gang Intelligence Unit, with gang intelligence officers working directly at County's jails. The gang intelligence officers monitor gang management information, serve as liaisons to the California Department of Corrections and Rehabilitation and law enforcement agencies, and conduct the security and program reviews.[3] Given the frequency at which new inmates are housed within the Elmwood Facility, and the level of expertise regarding gang-related matters amongst the staff, Does 3 through 8should have been alerted to the imminence of the danger Plaintiff was in, and should have protected him from being beaten. County, therefore, has a policy and practice of not ensuring inmates are housed in areas where they will be safe from gang violence, and a policy and practice of failing to supervise prison pods to prevent physical violence among inmates. These policies and practices directly caused Plaintiff to incur extensive injuries and permanent physical and psychological injury.

25.    Plaintiff's injuries were so severe that immediately after the incident, Plaintiff was not treated locally on-site at the Elmwood Facility, but rather taken to Santa Clara County Valley Medical Center ("SCCVMC") for emergency treatment. Plaintiff received a MRI and X-rays at SCCVMC. As a result of the Beating, Plaintiff suffered multiple facial fractures, including a left subcondylar/ramus fracture, a ZMC fracture, maxillary sinus wall fractures and an orbital wall fracture.

26.    Due to the orbital wall fracture, Plaintiff's vision was impaired. Plaintiff was not provided with medical follow-up treatment with Ophthalmology for his vision impairment from the left orbital wall fracture. Plaintiff's vision is now permanently impaired from the left orbital wall fracture, and to

---

[3] County of Santa Clara, California – Final Report, Department of Correction Needs Assessment/Facilities Study, December 2014, p. 90, https://sccgov.iqm2.com/Citizens/FileOpen.aspx?Type=4&ID=133780.

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

gain even the slightest margin of correction, Plaintiff now requires a specialty lens prescription, which he cannot afford.

27.    The doctor evaluating Plaintiff at SCCVMC determined that Plaintiff required surgery. Due to the facial fractures he incurred, two days after the Beating, Plaintiff had a surgery, in which a metal plate was inserted into his face and his jaw was wired shut. Because of the severity of the injuries, and the number of repairs needed to be made to Plaintiff's face, the procedure lasted for a duration of seven to nine hours. Plaintiff stayed in SCCVMC for 24 hours after surgery. Plaintiff was then transported back to the Elmwood Facility and housed in the infirmary for two to three weeks. During his entire time in the infirmary, Plaintiff's jaw was wired shut.

28.    After the Beating and the lengthy surgery, Plaintiff was in severe pain. Plaintiff was provided 300 mg of Motrin and 30 mg of oxycodone per day. This is only days after being in-processed at the Main Jail and the Elmwood Facility, immediately before which he was taking 150 mg of oxycodone per day for his back pain. Plaintiff repeatedly told Does 9 through 12 that the medication provided was insufficient to manage his pain because his pre-incarceration pain treatment had left him with a higher tolerance to pain medication. However, Does 9 through 12 dismissd his explanation and denied his requests for any additional pain medication.

29.    While Plaintiff's jaw was wired shut, Plaintiff required an exclusively liquid-food diet to receive proper nutrition, as ordered by his physician. However, while Plaintiff was in the infirmary, Plaintiff was at times not provided the medically necessary liquid-food diet. Instead, Does 9 through 12 would at some meals only give meals consisting of pureed foods and other solid foods that were impossible for Plaintiff to eat. Plaintiff informed Does 9 through 12 of his inability to eat the foods, and that his physician had ordered an only liquid food diet, but Does 9 through 12 ignored Plaintiff's pleas.

30.    When the wiring was removed from Plaintiff's jaw, Plaintiff continued to have dental hardware on both sides of his jaw, limiting the movement of his jaw (the "Hardware"). This hardware included metal brackets attached to his molars, and other Hardware elements. Per his medical plan, Plaintiff was supposed to have follow-up appointments with an oral surgeon. When the wiring on Plaintiff's jaw was removed, Plaintiff's oral surgeon encouraged Plaintiff to begin transitioning to consuming solid foods to aid in the healing process of his jaw. Plaintiff's physician emphasized that this

1    should be a gradual transition, and that if Plaintiff experienced any pain from this that he should

2    discontinue the solid food and return to the liquid diet. However, Does 9 through 12 immediately put

3    Plaintiff on a completely solid food diet, which Plaintiff was unable to eat. Because he was unable to

4    eat, Plaintiff made numerous requests to Does 9 through 12 to see an oral surgeon. Plaintiff made

5    approximately 15 inmate requests, filed approximately four grievances, and appealed two of his

6    grievances to the Elmwood Facility to secure medical care. Plaintiff also made several white card[4]

7    requests to see the nurse conducting daily medical rounds in the Elmwood Facility, but the nurse denied

8    Plaintiff's request because his appointment was "coming up."

9        31.    Does 9 through 12 refused to take Plaintiff to see an oral surgeon, despite his numerous

10   written and verbal requests to do so. Thus, the Hardware was in Plaintiff's mouth two to three weeks

11   longer than was medically necessary and directed. During this time that the Hardware was unnecessarily

12   in Plaintiff's mouth, Does 9 through 12's failure to provide access to medical care caused Plaintiff to

13   sustain multiple lacerations and open sores inside his mouth.

14       32.    During the time Plaintiff had his jaw wired shut, and while Plaintiff had the Hardware,

15   Does 9 through 12 failed to provide Plaintiff with adequate nutrition in accordance with his physician's

16   treatment plan, which caused Plaintiff to lose 25 to 30 pounds in body weight. Does 9 through 12 ignored

17   Plaintiff's numerous requests for access to medical services, which resulted in unnecessary pain and

18   additional injuries to Plaintiff, including severe weight loss and multiple lacerations and open mouth

19   sores because of Does 9 through 12's failure.

20       33.    County was aware that its Elmwood Facility had a prevalent issue with its grievance

21   system, with many inmates reporting "numerous ways, such as officers refusing to accept grievance

22   submissions, in which their grievances are not treated seriously."[5] County was also aware that "[i]nmates

23   consistently complained of long delays and outright denials of access to medical and dental care.

24   Common complaints included difficulty in getting medical attention, appointments and prescriptions …

25

26   ---
     [4] Inmates use a white card to request care.

27   [5] See Jail Conditions: Inmate, Staff & Family Perspectives Report to Santa Clara County Blue Ribbon Commission,
     February 20, 2016, p. 1. On October 6, 2015, the County Board of Supervisors approved a Resolution establishing the Blue
     Ribbon Commission on Improving Custody Operations.  The purpose of the Blue Ribbon Commission is to assess custody
28   operations and to recommend improvements. (https://www.sccgov.org/sites/scc/Pages/brc.aspx)

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A.
TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

optometry is completely unavailable, and it takes weeks or months to see a doctor for urgent health issues."[6] Therefore, Plaintiff was one of many inmates in County's care sharing the same experience of County's longstanding policy and practice of not ensuring access to timely medical care. This policy and practice directly resulted in Plaintiff sustaining unnecessary pain and injuries in his mouth, including multiple lacerations and open sores.

**FIRST CAUSE OF ACTION**

**42 U.S.C. § 1983 – Failure to Protect**

**Against Does 3 through 8, inclusive and Santa Clara County**

34.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-33 of this Complaint as though fully set forth herein.

35.     Does 3 through 8 could have taken action to prevent unnecessary harm to Plaintiff, but refused or failed to do so.

36.     Does 3 through 8 demonstrated deliberate indifference to their constitutional obligation to protect Plaintiff from harm.

37.     Does 3 through 8 were on notice that Plaintiff faced a heighted risk of harm, as Plaintiff was subject to and reported sexual harassment, which resulted in the opening of an investigation under the Act.

38.     Does 3 through 8 were on notice that Plaintiff faced a heighted risk of harm at the hands of Norteño gang members because the individuals who sexually harassed Plaintiff were Norteño gang members, and Plaintiff refused their advances and reported the activity to the guards.

39.     Does 3 through 8 knew or should have known that tattoo body inspections occur when a Hispanic male is placed in a new housing unit in the Elmwood Facility, and that Plaintiff, as a non-gang affiliated Hispanic male, would be at a heightened risk for gang violence and violence by Norteño gang members. Does 3 through 8 failed to house Plaintiff where he would not be at a heightened risk for gang violence.

---

[6] *Id.* at 23. Approximately 509 of the 944 interviewees (54%) spoke about their access to medical care or the quality of medical care they receive.

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A.
TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

40.     Does 6 through 8 failed to adequately supervise Plaintiff in M8A, despite the large glass window which can be used to view into the open pod area. Given Does 6 through 8's knowledge of common gang practices within the Elmwood Facility, this failure constitutes an act of deliberate indifference to Plaintiff's safety.

41.     Does 6 through 8 failed to protect Plaintiff from being ruthlessly beaten by Norteño gang members, even though Plaintiff was in clear view of the large glass window looking into M8A. This constitutes deliberate indifference to Plaintiff's safety. During the Beating, Does 6 through 8 did not issue any verbal warning or direction for the inmates to disperse, nor did Does 6 through 8 use their pepper spray, which could have been deployed from a safe distance to encourage the inmates to disperse. Does 6 through 8 did not attempt any other protective countermeasure, despite the fact that the location of the Beating was monitored by video cameras and numerous guards on-site.

42.     The County has a policy and practice of not ensuring inmates are housed in areas where they will be safe from gang violence, and a policy and practice of failing to supervise prison pods to prevent physical violence among inmates. These policies and practices directly caused Plaintiff to be beaten by Norteño gang members upon placement in M8A with no attempt at intervention by the guards, demonstrating County's deliberate indifference to Plaintiff's safety.

43.     As a result of Does 3 through 8 and the County's failure to protect Plaintiff, Plaintiff suffered multiple facial fractures from the Beating, including a left subcondylar/ramus fracture, a ZMC fracture, maxillary sinus wall fractures and an orbital wall fracture, which constitute serious injuries. The injuries required surgery in which a metal plate was inserted in Plaintiff's face, and Plaintiff's jaw being wired shut. As a result of Does 3 through 8 and the County's policies and procedures, Plaintiff was seriously injured during the Beating, resulting in permanent physical and psychological harm to Plaintiff.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 – Deliberate Indifference to Serious Medical Needs**

**Against Does 1 through 2 and Does 9 through 12, inclusive and Santa Clara County**

44.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-43 of this Complaint as though fully set forth herein.

45.     After being treated for injuries resulting from the Beating, a metal plate was surgically installed in Plaintiff's face and his jaw was wired shut. Accordingly, his primary care physician put him on an exclusively liquid-food diet since he could not chew. Does 9 through 12 at times only provided Plaintiff pureed and solid foods that he was unable to consume, which caused Plaintiff to unnecessarily lose an unhealthy amount of weight in a short amount of time. Plaintiff informed Does 9 through 12 of his medically ordered diet, but Does 9 through 12 ignored Plaintiff's pleas.

46.     Does 9 through 12 were provided a medical plan by Plaintiff's oral surgeon requiring follow-up visits, and Plaintiff made written requests to Does 9 through 12 to see an oral surgeon to have his temporary dental crossbars removed. Does 9 through 12 failed to take Plaintiff for follow-up visits to remove his temporary dental cross bars as dictated by his medical treatment plan, causing the temporary cross bars to be left on weeks longer than medically necessary. As a result, Plaintiff was forced to remain on a liquid-food diet. Transitioning to a solid-food diet was medically important so that Plaintiff's jaw would heal properly, however, Does 9 through 12 were deliberately indifferent to Plaintiff's medical needs and did not ensure he had sufficient access to his medical appointments. Does 9 through 12 displayed deliberate indifference to their constitutional obligation to provide minimally adequate medical care to Plaintiff by failing to permit Plaintiff to attend appropriate follow-up, post-operative appointments with an oral surgeon despite his physician's clear order, and Plaintiff's persistent written requests to do so.

47.     Does 9 through 12 failed to act on Plaintiff's written requests regarding the fact that he still had temporary dental cross bars implanted, which were shredding his mouth and causing painful open sores. This failure to act caused significant delays in Plaintiff receiving medical treatment, leading to further harm to Plaintiff.

48.     Plaintiff suffered eye injuries and vision problems from the Beating. Does 9 through 12 failed to allow Plaintiff to receive follow-up treatment for his vision problems, causing permanent damage to Plaintiff's vision.

49.     The County had a longstanding policy and practice of not ensuring inmates have access to timely medical care. This policy and practice directly resulted in Plaintiff sustaining unnecessary pain and injuries in his mouth and losing substantial weight. County also failed to promulgate sufficient

policies, procedures and practices for ensuring that medical follow-up appointments occur in accordance with inmates' physician's orders.

50.    County had a policy and practice of consistently not responding to inmate medical requests, including follow up appointments, despite clear instructions from inmates' primary care provider for these appointments to occur on a specific schedule. County also failed to promulgate sufficient policies, procedures and practices to adequately train and/or supervise its staff on how to respond to written requests for medical care. This consistent failure encouraged a custom and practice of routinely denying, or significantly delaying, necessary medical treatment of inmates, evidencing County's deliberate indifference to Plaintiff's medical needs.

51.    County has an established policy and practice of not ensuring inmates are properly evaluated for chronos, and not ensuring that those inmates with legitimate need receive proper chronos. This policy and practice directly resulted in Plaintiff not receiving his needed accommodations, unnecessary pain, and a subsequent shoulder injury, evidencing County's deliberate indifference to Plaintiff's medical needs, health and safety.

52.    Because of Does 1 through 2's and Does 9 through 12's refusal to provide a shoe chrono, Plaintiff was unable to maintain his stability and fell as a result, suffering severe injuries to his shoulder. Does 1 through 2 and Does 9 through 12 failed to provide Plaintiff a shoe chrono to help remedy the instability caused by his documented and reported back problems, which would have prevented said shoulder injury.

53.    Due to Does 1 through 2's, Does 9 through 12's, and County's deliberate indifference, Plaintiff suffered serious injuries, including extreme weight loss, permanent vision impairment to his left periphery, injuries to his shoulder and mouth, and ongoing psychological impairment.

### THIRD CAUSE OF ACTION

**42 U.S.C. §§ 12101 *et seq*. – Title II of the Americans with Disabilities Act**

**Against Santa Clara County**

54.    Plaintiff re-alleges and incorporates by reference Paragraphs 1-53 of this Complaint as though fully set forth herein.

55.     Plaintiff is an individual with a disability that impacts his daily life. Plaintiff has had a herniation in his lower back disks since at least 2005 and has been receiving focused medical treatment for this serious herniation since 2011, including narcotic pain medication and special shoe insoles. This condition has been documented in Plaintiff's medical records, information which Plaintiff told Does 1 through 2 at his initial medical screening. Plaintiff is still medically treated for his chronic back issues monthly. He is prescribed and takes narcotic medication and uses insoles as treatment for his condition.

56.     The programs, services, and activities that County provides to prisoners include, but are not limited to, sleeping, eating, showering, toileting, exercising, safety and security. They also include Main Jail's and Elmwood Facility's medical and dental services. County's programs, services, and activities are covered by the ADA.

57.     Does 1 through 2 and Does 9 through 12 refused Plaintiff's repeated requests for chronos (including a shoe chrono and a lower bunk chrono) as an accommodation for his disability, which would have allowed him to avoid pain arising from his disability and participate in or receive the benefits of County's programs and services. However, Does 1 through 2 denied Plaintiff's requests for reasonable accommodations, based on their brief visual assessment of his lower back herniation, which did not manifest physically in their observation of the three to four steps Plaintiff took in and out of the examination room.

58.     Does 1 through 2 and Does 9 through 12 failed to provide Plaintiff any accommodations for his disability, despite his repeated requests and the documented history of his disability. Does 1 through 2 and Does 9 through 12 forced Plaintiff to endure substantial pain by failing to accommodate Plaintiff's disability. Without the requested accommodations, it was extremely difficult for Plaintiff to sleep, exercise, and to move about the facility with stability and security, as other inmates not suffering from his disability were able to do.

59.     Upon information and belief, chronos are provided to prisoners with similar disabilities as Plaintiff (including lower bunk and shoe chronos).

60.     Plaintiff was denied the chronos he requested for shoes and a lower bunk on the basis of his disability.

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

61.     Due to Does 1 through 2 and Does 9 through 12's refusal to allow Plaintiff to attend his follow up appointments, and their consistent practice of refusing or ignoring his requests for medical care, Plaintiff was denied full and meaningful access to County's medical services, a program or activity covered by the ADA's protection. Full and meaningful access, among other things, would have included a thorough examination of Plaintiff's injuries to make an accurate determination of his need for chronos. Full and meaningful access would have included the ability for Plaintiff to attend his follow up appointments in accordance with the medical treatment plan ordered by his physician. Instead, Does 1 through 2 gave Plaintiff only a partial examination, insufficient to make a chronos determination, and Does 9 through 12 refused Plaintiff's requests to attend follow up appointments and to receive additional medical attention. Based on his disability, the nature of which did not always physically manifest itself, Plaintiff was denied access to County's programs and activities.

62.     Does 1 through 2 and Does 9 through 12 further denied Plaintiff access to medical services by refusing to make reasonable accommodations to provide him with his prescribed dosage of oxycodone. Does 1 through 2's refusing to ensure the continuity and care of Plaintiff's medication at intake, and Does 9 through 12's refusing to prescribe an adequate dosage after Plaintiff's surgery denied Plaintiff medical care, a service provided by County from which disabled prisoners must not be excluded or be subjected to discrimination.

63.     Plaintiff relied upon oxycodone for multiple years to treat the severe pain from his disability. Does 1 through 2 and Does 9 through 12 withheld Plaintiff's medication, which forced Plaintiff to endure painful and dangerous withdrawal symptoms. Does 1 through 2 and Does 9 through 12's forcing Plaintiff to endure painful withdrawals was not an adequate response to Plaintiff's request for reasonable accommodations.

64.     Does 1 through 2 and Does 9 through 12 denied Plaintiff the benefits of County's health services and discriminated against him on the basis of his disability. The County's policy and practice of failing to ensure that inmates with a disability are properly accommodated violates the ADA, directly caused Plaintiff to incur substantial damage to his shoulder, and forced Plaintiff to needlessly endure pain and opiate withdrawal.

**FOURTH CAUSE OF ACTION**

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794

**29 U.S.C. § 12101 794 – Section 504 of the Rehabilitation Act**

**Against Santa Clara County**

65.     Plaintiff re-alleges and incorporates by reference Paragraphs 1-64 of this Complaint as though fully set forth herein.

66.     Upon information and belief, the County receives state and federal funds for the operation of the Main Jail and the Elmwood Facility, and has received such funds at all times relevant to allegations raised in this Complaint.

67.     Plaintiff is an individual with a disability that impacts his daily life. Plaintiff has had a herniation in his lower back disks since at least 2005 and has been receiving focused medical treatment for this serious herniation since 2011, including narcotic pain medication and special shoe insoles. This condition has been documented in Plaintiff's medical records, information which Plaintiff told Does 1 through 2 at his initial medical screening. Plaintiff is still medically treated for his chronic back issues monthly. He is prescribed and takes narcotic medication and uses insoles as treatment for his condition.

68.     The programs, services, and activities that County provides to prisoners include, but are not limited to, sleeping, eating, showering, toileting, exercising, safety and security. They also include Main Jail's and Elmwood Facility's medical and dental services. County's programs, services, and activities are covered by the ADA and Rehabilitation Act.

69.     Does 1 through 2 and Does 9 through 12 refused Plaintiff's repeated requests for chronos (including a shoe chrono and a lower bunk chrono) as an accommodation for his disability, which would have allowed him to avoid pain arising from his disability and participate in or receive the benefits of County's programs and services. However, Does 1 through 2 denied Plaintiff's requests for reasonable accommodations, based on their brief visual assessment of his lower back herniation, which did not manifest physically in their observation of the three to four steps Plaintiff took in and out of the examination room.

70.     Does 1 through 2 and Does 9 through 12 failed to provide Plaintiff any accommodations for his disability, despite his repeated requests and the documented history of his disability. Does 1 through 2 and Does 9 through 12 forced Plaintiff to endure substantial pain by failing to accommodate Plaintiff's disability. Without the requested accommodations, it was extremely difficult for Plaintiff to

16

1    sleep, exercise, and to move about the facility with stability and security, as other inmates not suffering
2    from his disability were able to do.

3          71.    Upon information and belief, chronos are provided to prisoners with similar disabilities
4    as Plaintiff (including lower bunk and shoe chronos).

5          72.    Plaintiff was denied the chronos he requested for shoes and a lower bunk on the basis of
6    his disability.

7          73.    Due to Does 1 through 2 and Does 9 through 12's refusal to allow Plaintiff to attend his
8    follow up appointments, and their consistent practice of ignoring his requests for medical care, Plaintiff
9    was denied full and meaningful access to County's medical services, a program or activity covered by
10   the ADA's and Rehabilitation Act's protection. Full and meaningful access, among other things, would
11   have included a thorough examination of Plaintiff's injuries to make an accurate determination of his
12   need for chronos. Full and meaningful access would have included the ability for Plaintiff to attend his
13   follow up appointments in accordance with the medical treatment plan ordered by his physician. Instead,
14   Does 1 through 2 gave Plaintiff only a partial examination, insufficient to make a chronos determination,
15   and Does 9 through 12 refused Plaintiff's requests to attend follow up appointments and to receive
16   additional medical attention. Based on his disability, the nature of which did not always physically
17   manifest itself, Plaintiff was denied access to County's programs and activities.

18         74.    Does 1 through 2 and Does 9 through 12 further denied Plaintiff access to medical
19   services by refusing to make reasonable accommodations to provide him with his prescribed dosage of
20   oxycodone. Does 1 through 2's refusing to ensure the continuity and care of medication at intake and
21   Does 9 through 12's refusing to prescribe an adequate dosage after Plaintiff's surgery denied Plaintiff
22   medical care, a service provided by County from which disabled prisoners must not be excluded or be
23   subjected to discrimination.

24         75.    Plaintiff relied upon oxycodone for multiple years to treat the severe pain from his
25   disability. Does 1 through 2 and Does 9 through 12 withheld Plaintiff's medication, which forces painful
26   and dangerous withdrawals. These forced withdrawals do not qualify as reasonable accommodations.

27         76.    Does 1 through 2 and Does 9 through 12 denied Plaintiff the benefits of County's health
28   services and discriminated him on the basis of his disability. The County's policy and practice of failing

17

to ensure that inmates with a disability are properly accommodated violates the ADA and the Rehabilitation Act, and directly caused Plaintiff to incur substantial damage to his shoulder, and forced Plaintiff to needlessly endure pain and opiate withdrawal.

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for relief and judgment from this Court as follows:

1.      For compensatory, general and special damages against each Defendant, jointly and severally, in an amount to be proven at trial;

2.      For prejudgment interest;

3.      For costs of suit and reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12205, 29 U.S.C. § 794a(b), 42 U.S.C. § 1988, and as otherwise authorized by statute or law;

4.      For restitution as the court deems just and proper;

5.      For such other and further relief that the Court deems just and proper under the circumstances of this case.


Dated:   June 25, 2019                          Respectfully submitted,

**BAKER BOTTS L.L.P.**

By ____*/s/ Karina A. Smith*_____
Karina A. Smith (SBN 286680)
karina.smith@bakerbotts.com
Brooke Chatterton (SBN 317386)
brooke.chatterton@bakerbotts.com
BAKER BOTTS L.L.P.
1001 Page Mill Road, Bldg. One, Suite 200
Palo Alto, CA  94304
Telephone: (650) 739-7500
Facsimile: (650) 739-7699

*Attorneys for Plaintiff*

THIRD AMENDED COMPLAINT FOR VIOLATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983, A.D.A. TITLE II, 42 U.S.C. § 12101 et seq., AND SECTION 504 OF THE REHABILITATION ACT, 29 U.S.C. § 794